# JACKSONWHITE
## ATTORNEYS AT LAW
### A Professional Corporation

40 North Center Street, Suite 200
Mesa, Arizona 85201
T: (480) 464-1111   F: (480) 464-5692
Attorneys for Plaintiffs
Email: centraldocket@jacksonwhitelaw.com
By:   Michael R. Pruitt, No. 011792
      mpruitt@jacksonwhitelaw.com
      Nathaniel Hill, No. 028151
      nhill@jacksonwhitelaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Susan Hamlin, filing individually and on behalf of all others similarly situated; and Paul Hanks, filing individually and on behalf of all others similarly situated. <br><br> Plaintiffs, <br> vs. <br><br> Katerra, Inc., a foreign corporation; <br><br> Defendant. | Case No.: <br><br> **COMPLAINT** <br><br> **(Jury Trial Requested)** |

Named Plaintiffs, Susan Hamlin and Paul Hanks, each filing as an individual and on behalf of all other similarly situated current and former employees of Katerra, Inc. ("Katerra"), by and through their counsel undersigned, and for their Complaint allege as follows:

**JURISDICTIONAL ALLEGATIONS**

1. This action arises from the illegal employment actions of Defendant Katerra under the statutes of the United States involving violations of the overtime wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.

2. As this matter arises under federal statute, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3. As provided for by the FLSA, 29 U.S.C. § 216(b), this action is brought by each of the named Plaintiffs as an individual and as a collective action on behalf of all current and former similarly situated employees of Katerra.

4. Katerra is a covered employer and enterprise subject to the provisions of the FLSA since it is involved in interstate commerce and generates annual revenue in excess of $500,000.

5. During the relevant time period, the named Plaintiffs and those similarly situated were employees of Katerra covered by the provisions and protections contained in the FLSA.

6. During the relevant time period, the job duties of the named Plaintiffs and those similarly situated were such that they were engaged in interstate commerce as defined by the FLSA.

7. Venue is appropriate to this court as most or all of the acts alleged herein occurred within the geographic region covered by this District in the State of Arizona, and Defendant Katerra conducts significant business operations within this District.

**PARTIES**

8. Katerra is a foreign corporation registered with the Arizona Corporation Commission with its main North American Headquarters in Menlo Park, California.

9. Katerra conducts business operations and has facilities and factories in multiple locations including Arizona, California, and the state of Washington.

10. During the relevant time period, Katerra operated multiple facilities in the Phoenix, Arizona metropolitan area. These facilities included an office in Scottsdale, Arizona, a Component & Finish Factory on 44th Avenue in west Phoenix, Arizona, and during a portion of the relevant time period, a factory in Glendale, Arizona.

11. At all times relevant hereto, named Plaintiff Susan Hamlin was a resident of the State of Arizona and subject to the jurisdiction of the U.S. District Court for Arizona.

12. At all times relevant hereto, named Plaintiff Paul Hanks was a resident of the State of Arizona and subject to the jurisdiction of the U.S. District Court for Arizona.

13. As required under the FLSA, each of the named Plaintiffs has filed a written consent form with the Court attached hereto as Exhibit A, making each a party in this action.

## BACKGROUND FACTS

14. Under the FLSA, 29 U.S.C. § 207, covered employees such as the named Plaintiffs and those similarly situated are required to receive overtime wages at a rate of at least 1½ times their normal hourly rate for hours worked in excess of forty during a workweek unless they properly qualify for a specific exemption contained in the FLSA.

15. Named Plaintiff, Susan Hamlin, worked for Katerra as a Supplier Quality Manager working out of the Scottsdale office from October 24, 2016 through September 23, 2019.

16. Named Plaintiff, Paul Hanks, worked for Katerra as a Supplier Quality Manager working out of the Scottsdale office from on or about December 2016 through October 11, 2019.

17. Sometime after the named Plaintiffs and at least one other similarly situated individual were hired with the job title of Supplier Quality Manager, Katerra hired several similarly situated employees with the job title of Supplier Quality Engineer. These employees also worked out of the Scottsdale office. While the job titles differed, the role and essential duties of Supplier Quality Managers and Supplier Quality Engineers were identical.

18. While there may have been discussion of changing the job tile, but not the duties of the two named Plaintiffs, the two named Plaintiffs retained the job title of Supplier Quality Manager during the entire tenure of their employment with Katerra.

19. On information and belief, Katerra employs individuals in China with the job title of Supplier Quality Engineer. These individuals are not covered by this lawsuit.

20. This lawsuit solely involves Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, working in the Phoenix Arizona metropolitan area out of the Scottsdale office.

21. During the relevant time period, all Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, were classified as exempt employees. As such they were deemed by Katerra to be ineligible for overtime wages, and they were compensated on a salaried basis earning the same weekly compensation no matter how many hours they worked each workweek.

22. The Component & Finish Factory in west Phoenix, Arizona covered 250,000 square feet, employed approximately 400+ employees, and had the capacity to manufacture sufficient major structural components and finish products to build approximately 10,000 apartments per year. These structural components and finish products include interior wall panels, exterior wall panels, roof truss assemblies, floor systems, utility walls, cabinetry, and countertops. The utility wall panels include pre-installed plumbing and electrical wiring.

23. The wall panels assembled at the Component & Finish Factory included preinstalled windows. Cabinets were constructed at the factory using materials and cabinet doors purchased from vendors. After assembly, the cabinets were shipped to the project site for installation.

24. After manufacture and assembly at the Component & Finish Factory, the prefabricated structural components and finish products were transported to construction sites in various states to build multi-unit apartments. On information and belief, the majority of these construction sites were in the state of California.

25. Sometime in early December 2019, Katerrra announced it would close the west Phoenix Component & Finish Factory by the end of 2019 and move the assembly process to a brand new automated factory in Tracy, California.

26. While the Glendale, Arizona factory was closed prior to the filing of this lawsuit, during some of the relevant time period the Glendale factory manufactured various truss assemblies.

27. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, worked out of the Katerra office facility in Scottsdale, Arizona, commuted to the factory and assembly facilities in the Phoenix area, and traveled to various vendor and supplier manufacturing facilities located locally and throughout the United States and Canada.

28. After Katerra decided on what parts and components it wanted to purchase to build the various structural components, finished products and assemblies manufactured at the Phoenix factory facilities, the sourcing team for Katerra and the chosen vendor generated a Material Supply Agreement (MSA). The MSA documented the part being purchased, all requirements and qualifications for the part or component, all tolerances, testing, and quality assurance provisions, and the delivery schedule.

29. The Supplier Quality Manager and Supplier Quality Engineers, including the named Plaintiffs, played absolutely no role in selecting the vendors and suppliers used by Katerra.

30. The Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not have any role in generating or approving the MSA.

31. The duties of all Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, consisted of four major tasks. These included: 1) reviewing and rewriting existing department documents; 2) performing Product Qualification Tests (PQT) certifying the specific products and components utilized in the fabrication process; 3) being involved in the inspection and rework of parts, materials and components utilized at the Phoenix factory facilities; and 4) conducting Supplier On-Site Assessments.

32. The review and rewrite process performed by Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, on department documents

consisted of such things as interacting with inspectors, engineers, and management, and observing the existing inspection process or department procedures, and then updating and rewriting the department document so it accurately reflected existing department procedures.

33. For the PQT process, all documents, testing procedures, and required measurements and results to pass the testing, were written and developed by the compliance and regulation teams. The Supplier Quality Managers and Supplier Quality Engineers did not play any role in developing the PQT requirements.

34. PQT testing was typically done at the vendor site by the Supplier Quality Manager or Supplier Quality Engineer, or involved sending parts to a third party laboratory for testing. PQT testing could also occasionally be conducted at a Katerra facility.

35. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not create the inspection and measurement process and procedures each part or component underwent prior to being used to fabricate and construct components, finished products and assemblies.

36. Supplier Quality Engineers and the named Plaintiffs did not create the documents outlining the inspection and measurement process.

37. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, also worked closely with the employees performing the inspection of parts, components, and assemblies at the Component & Finish Factory.

38. These inspections verified that the parts, components, and assemblies met detailed inspection criteria and requirements developed by manufacturing engineers and Katerra management.

39. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, generated detailed reports documenting by lot, vendor and part type, inspection results such as the number of items passing or failing, the number of items sent for rework, and the number of items returned to vendors.

40. If an inspector had a question regarding the inspection process or whether a part or component met the detailed inspection parameters, the inspector typically contacted a Supplier Quality Manager or Supplier Quality Engineer, such as the named Plaintiffs, to discuss and review the matter.

41. In deciding whether or not an item failed inspection, the Supplier Quality Manager or Supplier Quality Engineer, including the named Plaintiffs, would review detailed inspection documents and manufacturing requirements, or receive guidance from other Katerra employees such as manufacturing engineers, global sourcing managers, or members of department management.

42. If there was still a question regarding the usability of an item that appeared to fail inspection or be out of tolerance, the matter was referred to a Material Review Board (MRB) or manufacturing engineer to make a decision regarding disposition of the item. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not have authority to approve the use of items that deviated or failed inspection criteria.

43. Items that failed inspection might be reworked to correct the observed defect.

44. Separate and apart from PQT testing, Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, were also responsible for verifying any additional required testing or quality assurance process had been performed and that the various parts or component lots had passed.

45. The fourth major task performed by Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, was auditing and certification of vendors and suppliers through the process of Supplier On-Site Assessments. Supplier On-Site Assessments were also known as Supplier On-Boarding.

46. Vendors and suppliers would be typically designated for certification through a Supplier On-Site Assessment after Katerra and the vendor had an MSA in place and an agreement to purchase parts.

47. On several occasions, Katerra began utilizing parts and components from a vendor or supplier before the Supplier On-Site Assessment had been conducted.

48. Once a vendor or supplier is designated to undergo a Supplier On-Site Assessment, the responsible Supplier Quality Manager or Supplier Quality Engineer, including the named Plaintiffs, was responsible for scheduling travel and making the arrangements with the vendor or supplier.

49. Katerra management generated a detailed procedure for conducting Supplier On-Site Assessments. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not have a role in the initial creation of document.

50. All suppliers and vendors were covered by the same Supplier On-Site Assessment procedure.

51. The procedure for Supplier On-Site Assessments was based on criteria developed from the International Standards Organization (ISO), which identifies what to look for and verify when certifying and approving a vendor or supplier.

52. In order to provide Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, with detailed clear guidance in what to look for and how to evaluate each of the numerous designated areas for review and evaluation, Katerra management generated a detailed Supplier On-Site Assessment spreadsheet form. The Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not have any role in initially creating the Supplier On-Site Assessment spreadsheet form.

53. At any one time, the department utilized one Supplier On-Site Assessment form for all vendors and suppliers.

54. A copy of the detailed Supplier On-Site Assessment spreadsheet form was provided to the vendor or supplier prior to the on-site assessment. The vendor or supplier then conducted a self-assessment allowing them to prepare for the on-site assessment with full and complete knowledge of what topics and issues would be reviewed and the specific

criteria used for the evaluation. On information and belief, this was done deliberately by Katerra to help ensure that the vendor always passed the Supplier On-Site Assessment.

55. After arriving at the vendor or supplier, each Supplier Quality Manager or Supplier Quality Engineer, including the named Plaintiffs, toured the facility and completed the detailed Supplier On-Site Assessment form.

56. Based on the detailed guidance and criteria found in the form for each of the categories and topics, the Supplier Quality Manager or Supplier Quality Engineer, including the named Plaintiffs, made a few notes and assigned a numerical grade for each topic, item or area for review.

57. The spreadsheet form then automatically generated an overall score indicating whether the vendor or supplier had passed or failed the Supplier On-Site Assessment.

58. During the approximately three years that named Plaintiff Hamlin worked as a Supplier Quality Manager, she recalls only failing one vendor. This vendor was oriented strand board (OSB) manufacturer Georgia Pacific.

59. Despite Georgia Pacific failing the Supplier On-Site Assessment conducted by Ms. Hamlin, Katerra continued to buy and utilize OSB wood product from Georgia Pacific in the wall assemblies constructed at the Component & Finish Factory.

60. During the approximately three years that named Plaintiff Hanks worked as a Supplier Quality Manager, he recalls failing at least one supplier.

61. Despite failing the Supplier On-Site Assessment conducted by Mr. Hanks, Katerra ignored the failure and continued to utilize the supplier.

62. Each Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, was assigned a specific group of items and materials.

63. Named Plaintiff Hamlin initially handled lumber, tile, countertops, hardware, drywall and cabinets. In 2017, some of these items were reassigned to other Supplier Quality Managers or Supplier Quality Engineers and she was assigned to work extensively with windows. Despite this change, Ms. Hamlin performed her duties in the same basic manner and way she had performed them prior to the reassignment.

64. Named Plaintiff Hanks was assigned to work with cement, lumber, truss components, and fasteners.

65. Named Plaintiff Hamlin personally performed manual rework on windows that failed inspections. The most common form of rework on windows resulted from the lack of a sticker verifying the vendor had performed required certification and quality assurance testing prior to shipping the window to Katerra. Ms. Hamlin would then contact the vendor, ascertain if certification testing had been performed, and if the quality assurance testing had been conducted, affixed labels she obtained from the vendor to the windows indicating it had passed certification testing by the vendor. This certification testing was separate and distinct from PQT and other testing performed by Katerra.

66. Other manual rework on windows personally performed by Ms. Hamlin included using Liquid Vinyl to repair windows, including replacing or reattaching weather stripping and molding, repairing or replacing locks, or using a heat gun to rework cosmetic defects or reshape warped windows.

67. Named Plaintiff Hamlin was trained in some of these rework procedures by the vendor.

68. Each Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, kept their supervisor and department management informed of the work performed through extensive weekly status reports, commonly referred to as weeklies.

69. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, attended frequent department meetings, and were in frequent contact with their supervisor and department management through telephone calls, text messages, e-mails, and computerized instant messaging.

70. As described herein, the duties of Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, were such that they should not have been classified as exempt under the FLSA and should have legally collected overtime pay when they worked over 40 hours in any one workweek.

71. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, routinely worked well in excess of 40 hours in an average workweek. As a result, all Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, were illegally denied overtime wages in violation of the FLSA.

72. The Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, performed their duties according to rigid standardized company procedures that did not allow for deviation, discretion, or independent judgment.

73. Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, have personal knowledge of the duties performed by the other Supplier Quality Managers and Supplier Quality Engineers working in the Phoenix metropolitan area. This knowledge was gained through direct observation, communication and interaction with their fellow similarly situated employees, attending department meetings, and through department e-mails. All Supplier Quality Managers and Supplier Quality Engineers working in the Phoenix metropolitan area, including the named Plaintiffs, worked out of the same office and factory location, utilized common company policies and procedures to perform their duties, and operated under a common payroll and HR system.

74. At any single point in time all Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, reported to one supervisor and had the same department management.

75. Katerra's classification of the named Plaintiffs and all others similarly situated as exempt from the payment of overtime wages was a violation of the FLSA.

76. The named Plaintiffs have direct personal knowledge through personal observation and interacting with other similarly situated employees, their supervisor and department management, that all Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, were expected to routinely work over 40 hours during a typical workweek.

77. The FLSA requires employers to keep accurate records related to compensation and hours worked by all non-exempt covered employees.

78. Defendant Katerra willfully and knowingly failed to maintain a full record and accounting of the number of hours worked by the named Plaintiffs and all others similarly situated in violation of the record keeping requirements of the FLSA.

79. This collective action is brought to recover unpaid overtime wages, liquidated damages, interest, attorneys' fees and all other damages and penalties owed and available to the named Plaintiffs and all those similarly situated.

80. The duties of a Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, did not involve managing the enterprise or a department or subdivision of the enterprise.

81. The Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, did not customarily and regularly direct the work of two or more other full time employees or their equivalent.

82. The Supplier Quality Managers and Supplier Quality Engineers, including the named Plaintiffs, did not have authority to hire or fire other employees.

83. The Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, did not make suggestions and recommendations given any particular weight as to the firing, advancement, promotion or other change of status of other employees.

84. The positions of Supplier Quality Manager and Supplier Quality Engineer did not rightly qualify for the FLSA's executive exemption from the payment of overtime wages.

85. The positions of Supplier Quality Manager and Supplier Quality Engineer entailed the use of skill in applying well-defined techniques, procedures, or specific standards rather than the exercise of discretion and independent judgment.

86. The inspection work performed by Supplier Quality Managers and Supplier Quality Engineers involved inspections performed along standardized lines involving well-established techniques and procedures outlined in detailed company policies and procedures. While Supplier Quality Managers and Supplier Quality Engineers may utilize

techniques and skills acquired by training or experience, they have no leeway to deviate outside clearly defined and closely prescribed limits.

87. The positions of Supplier Quality Manager and Supplier Quality Engineer did not have the discretion to depart from established company policies and procedures.

88. An assessment by a Supplier Quality Manager or Supplier Quality Engineer that a supplier or vendor failed a Supplier On-Site Assessment was given no weight by Katerra.

89. As described herein, the duties of the Supplier Quality Manager and Supplier Quality Engineer did not involve the exercise of discretion and independent judgment with respect to matters of significance.

90. The positions and duties of Supplier Quality Manager and Supplier Quality Engineer did not rightly qualify for the FLSA's administrative exemption from the payment of overtime wages.

91. During the relevant time period the named Plaintiffs or those similarly situated did not make sufficient compensation to qualify for the highly compensated exemption.

92. As described herein, the duties of the position of Supplier Quality Manager and Supplier Quality Engineers did not require the consistent exercise of discretion and judgment or knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.

93. The position of Supplier Quality Manager and Supplier Quality Engineer did not rightly qualify for the FLSA's learned professional exemption from the payment of overtime wages.

94. Katerra exercised centralized control over the wages, hours and working conditions of the named Plaintiffs and all others similarly situated.

95. This collective action arises from an ongoing illegal and improper scheme by Katerra to systematically and willfully violate the provisions of the FLSA by knowingly and deliberately failing to pay the named Plaintiffs and all others similarly situated the overtime wages legally due them.

96. The named Plaintiffs, on behalf of themselves and all other similarly situated current and former Katerra employees, allege that during the relevant time period, Katerra knowingly and willfully violated the provisions of the FLSA by falsely and improperly claiming that the named Plaintiffs and all others similarly situated were exempt from the overtime wage provisions of the FLSA. Because of the willful nature of the violation, the named Plaintiffs and those similarly situated are entitled to a three year statute of limitations period for the recovery of overtime wages as provided for by the FLSA

97. Katerra knew or should have known that during the relevant time period its policies regarding the payment of overtime wages violated the FLSA.

98. The actions of Defendant Katerra in violating the provisions of the FLSA were not taken in good faith and Katerra did not have a reasonable basis for believing during the relevant time period that its policies regarding the payment of overtime wages did not violate the FLSA.

99. All decision(s) regarding whether or not to pay overtime wages to the named Plaintiffs and all other similarly situated employees were made with the knowledge, approval and at the direction of Katerra's management and professional HR department.

100. The decision of Defendant Katerra to classify the named Plaintiffs and all others similarly situated employees as exempt from the payment of overtime wages was not taken after legitimate or good faith legal consultation or in response to a United States Department of Labor audit.

101. As an employer, Katerra is responsible for the illegal conduct and policies described herein related to its failure to comply with the provisions of the FLSA.

102. The actions of Katerra in deliberately failing to pay the named Plaintiffs and all others similarly situated the overtime wages rightfully due them was done for the purpose of enriching and benefitting Katerra. As a result, the named Plaintiffs and all others similarly situated have suffered economic damages.

# COLLECTIVE ACTION ALLEGATIONS

103. In addition to filing this action individually, each of the named Plaintiffs is also filing this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of all other similarly situated current and former Katerra employees.

104. As a collective action, all other similarly situated current and former Katerra employees may join this lawsuit by filing an executed consent to join form with the Court.

105. The named Plaintiffs intend to seek an order from this court providing notice to all similarly situated current and former employees of Katerra of the pendency of this action and their right to opt-in and join this lawsuit pursuant to the provisions of 29 U.S.C. § 216(b).

106. Given that the Plaintiffs have alleged a willful violation of the FLSA on the part of Katerra, the relevant time period for such notice is three years.

107. The group of those similarly situated consists of all current and former employees of Katerra with the job title of Supplier Quality Manager or Supplier Quality Engineer assigned to work in the Phoenix, Arizona metropolitan area and worked over 40 hours during any particular workweek during the last three years .

108. As appropriate, the named Plaintiffs reserve the right to amend and supplement the definition of the class of similarly situated employees as information is disclosed and uncovered through future discovery.

109. Given that there is a statute of limitations period associated with the collection of overtime damages under the FLSA, the named Plaintiffs intend to seek an expedited order from the Court directing that notice of this lawsuit be sent out to all those similarly situated.

## COUNT 1
### (Violation of the FLSA, 29 U.S.C. § 201 et seq.)

110. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

111. The named Plaintiffs and all others similarly situated formerly working in the position of Supplier Quality Manager and Supplier Quality Engineer, including the named Plaintiffs, were covered employees subject to the overtime wage provisions of the FLSA as outlined in 29 U.S.C. § 207.

112. The named Plaintiffs and all others similarly situated working as Supplier Quality Managers and Supplier Quality Engineers did not rightfully qualify at any time for an exemption to the payment of overtime wages.

113. During the relevant period, the named Plaintiffs and all others similarly situated routinely worked in excess of forty hours during their typical workweek without receiving overtime compensation in violation of the FLSA.

114. During much of the relevant time period, the named Plaintiffs and all others similarly situated were legally entitled to receive overtime compensation at a rate of one and one-half (1 ½) times their regular hourly wage for any hours worked in excess of forty hours in a workweek.

115. As a result of the illegal and improper policy of Katerra regarding the payment of overtime wages, the named Plaintiffs and all others similarly situated have suffered economic damages in an amount to be proved at trial.

116. The policy of Katerra to not pay overtime wages to the named Plaintiffs and all others similarly situated was willful, entitling the named Plaintiffs and all others similarly situated to extend the recovery period for damages from two years to three years as provided for by the FLSA and 29 U.S.C. § 255(a).

117. As provided for by the FLSA, Katerra is liable to the named Plaintiffs and all other similarly situated collective action members for liquidated damages in an amount equal to their economic damages

118. As provided for by the FLSA, Katerra is liable to the named Plaintiffs and all other similarly situated collective action members for their reasonable attorneys' fees and costs.

119.    As a result of violating the FLSA, Katerra is liable to the named Plaintiffs and all other similarly situated collective action members for all other relief and damages as provided for by law.

**WHEREFORE,** the named Plaintiffs individually and on behalf of all other similarly situated Katerra employees as defined herein, request that this Court enter judgment in their favor and against the Defendant as follows:

A. Declare and certify that this action can proceed as a collective action by the named Plaintiffs on behalf of all other similarly situated current and former Katerra employees working as Supplier Quality Managers and Supplier Quality Engineers improperly classified as exempt at any time during the previous three years;

B. Issue an Order that notice of this collective action shall be sent to those similarly situated current and former Katerra employees working as Supplier Quality Managers and Supplier Quality Engineers at any time during the past three years informing them of the opportunity to join this collective action if they believe they are owed overtime wages through the filing of consent to join forms with the Court;

C. Declare that the named Plaintiffs and all others similarly situated who join this collective action are legally entitled to collect overtime wages and that the policy of Katerra to not pay overtime wages to the named Plaintiffs and all others similarly situated during the relevant time period was illegal and a violation of the FLSA;

D. Declare that the actions of Katerra in failing to pay overtime wages to the named Plaintiffs and all others similarly situated was willful and that a three year statute of limitations shall apply for the purpose of collecting the overtime wages;

E. Enter a judgment against Katerra in an amount to be proved at trial as compensation to the named Plaintiffs and those similarly situated employees who join this collective action;

F.  Declare that the named Plaintiffs and those similarly situated employees who join this collective action are entitled to all relief and remedies available to them under the FLSA including all lost compensation, liquidated damages and attorneys' fees and costs;

G.  Award the named Plaintiffs and those similarly situated employees who join this collective action interest at the highest legal rate allowable on all sums awarded in judgment from the date of judgment until paid;

H.  Award the named Plaintiffs and those similarly situated employees who join this collective action prejudgment interest on all liquidated sums awarded at the highest legal rate allowable;

I.  That this Court retain jurisdiction over this action to ensure full compliance with the Court's orders and require Katerra to file such reports as the Court deems necessary to evaluate such compliance; and

J.  For such other and further relief as this Court deems just and proper.

**DATED** this 23rd day of December, 2019.

**JACKSON WHITE**
s/ Michael R. Pruitt
By: Michael R. Pruitt, No. 011792
Nathaniel Hill, No. 028151
40 North Center Street, Suite 200
Mesa, Arizona 85201
Attorneys for Plaintiffs